In re ESTATE OF LuRENE LAMM, deceased.

ROSALIA L. McANDREWS et al., appellants, v. MAXWELL KRAUSE, appellee.

No. 49181.

(Reported in 87 N.W.2d 756)

FEBRUARY 11, 1958.

REHEARING DENIED MAY 9, 1958.

Cutting & Cutting, of Decorah, and Carson & Carson, of Independence, for appellants.

Miller & Pearson, of Decorah, for appellee.

BLISS, J.—On February 13, 1954, Maxwell Krause, appellee, and proponent of the will of the deceased, LuRene Lamm, and the principal and residuary beneficiary thereunder, filed said instrument, together with his petition, in the District Court of Winneshiek County, Iowa, alleging that the deceased, late a resident of said County, on or about the fifth day of February, 1954, made and signed said instrument as and for her last will and testament, and praying that it be admitted to probate as provided by law. On the same day the will was duly recorded.

The will recited that LuRene Lamm of Decorah, Iowa, made, published and declared the instrument as her last will and testament. After revoking all prior wills, and providing for payment of her just debts, she made the following bequests in Paragraph III, to wit: To Boys Town, Nebraska, $1000; to Father O'Toole for himself, $500, and for Requiem Masses for herself, $500; to Wapsipinicon Area Council, Boy Scouts, $500;

to Maxwell Krause to be paid by him as soon after her decease as possible to any organized institution of his choice which cares for spastic children, regardless of color, $1000; to "Little Sisters of the Poor", $1000; to Catholic Negro Missions, $500; to the Pastor of the Assumption Catholic Church of Canton, Minnesota, $500; to the Pastor of every church in Decorah, for the benefit of each, including St. Benedict Catholic Church, $100 each; "to my sister, Rosalia L. McAndrews", $500; "to my sister, Anne L. Haagensen", $500; "to my nephew, Maxwell Krause, $1000 in trust for the benefit and use of my sister, Minnie Krause, within the sole discretion of the trustee; to my nephew, Maxwell Krause, in trust for the use and benefit of Billy Krause, within the sole discretion of the trustee, $500; to my nephew, Maxwell Krause, in trust for the use and benefit, and within his sole discretion, for Margarethe Krause and for Madeline Krause, $500" for each beneficiary. This was the bottom of the first page of the will and was signed, "LuRene Lamm."

"IV. All the rest, residue and remainder of my property, wherever situated, I give, devise and bequeath to my nephew, Maxwell Krause.

"V. I nominate Maxwell Krause as executor of this my Last Will and Testament.

"IN WITNESS WHEREOF, I have hereunto subscribed my name at Decorah, Iowa, this 5th day of February, 1954, in the presence of the undersigned, whom I have requested to act as attesting witnesses hereto. LuRene Lamm, Testatrix."

Below a proper attestation clause are the signatures of five witnesses to the execution of the will.

Of the family of the father of the testatrix, three of the eight children survived the testatrix, whose seventy-first natal anniversary was November 24, 1953, preceding her death on February 12, 1954, at St. Mary's Hospital in Rochester, Minnesota, where she had been taken by ambulance, accompanied by her physician, Dr. Ralph M. Dahlquist, on February 7, 1954, two days after the execution of the will. Her eldest sister, Armenia Krause, commonly spoken of as Minnie or Minnie May, died September 10, 1955. She was the mother of the proponent, Maxwell Krause. He had two brothers and two sisters. The brothers were Clinton, of Rochester, Minnesota, and Maurice, of

Leavenworth, Kansas, and his sisters were Madeline Wells, the eldest of the children, of Kansas City, Missouri, and Marguerite, of La Crosse, Wisconsin. Maxwell, the proponent, lived at Rushmore, Minnesota.

The other two sisters of the testatrix, who survived her, were the contestants, Anne L. Haagensen and Rosalia L. McAndrews. Mrs. Haagensen had lived away from Decorah for quite a few years, but returned in 1950 and continued to live there. The testatrix never married. She owned a home in Decorah at 228 East Water Street. Upon the death of her husband, John McAndrews, in 1943, Rosalia moved into the Water Street home of her sister LuRene, and the two lived there from that time until the evening of Friday, December 11, 1953, when LuRene was removed by ambulance to the hospital at Decorah, where she remained in Room 121 on the first floor until her dismissal on February 7, 1954, and removal to the Mayo Clinic at Rochester, Minnesota, where she was placed in St. Mary's Hospital.

The testatrix had made an earlier will which she left for safekeeping with some other papers in the Decorah State Bank. On December 20, 1953, Mr. E. R. Haines, age 82 years, president of said bank, and a former treasurer of Winneshiek County, was in the hospital room of LuRene Lamm, with whom he had a longtime acquaintance. As a witness for proponent, he testified that on this occasion Miss Lamm asked him to bring to her these papers, which he did on the evening of the following day, December 21, 1953. The papers were in two envelopes. At this time she gave to Mr. Haines a written receipt (proponent's Exhibit V), bearing said date, stating that she had received from him one envelope labeled "Last Will and Testament of LuRene Lamm" and "which has been held in Safekeeping by Decorah State Bank." To this receipt she signed "LuRene Lamm" in Mr. Haines' presence. It was retained by him until it was received in evidence, without objection.

Asked what Miss Lamm did with the instrument in the envelope, the witness testified that after stating it was her will "she tore it all up into shreds" in the presence of the witness. The witness further testified:

"Now, at the time Miss Lamm tore up this will in my presence, she said that she wanted to make another will but she wasn't quite ready to yet at that time." Asked what Miss Lamm did with the papers in the other envelope, the witness answered: "She was going to tear them up too but—

"Q. Who else was present besides yourself and Miss Lamm? A. Attorney Carroll Cutting. [Mr. Cutting is one of the attorneys for contestants in the proceeding at bar].

"Q. Tell the Court and jury what happened at that time and place when Miss Lamm was about to tear up the other papers. A. When she began to get ready to tear up those or have them torn up, I [witness Haines] asked whether she asked someone else to do it or not—There was a little discussion in looking at the deeds as to just what property each one covered and at that time Mr. Cutting asked if he couldn't take the deeds and copy the descriptions of them.

"Q. What did Miss Lamm say in substance, if anything? A. Well, my recollection is that she said that if I thought it was all right for Mr. Cutting to take the deeds and copy the descriptions that it would be all right.

"Q. Now state whether or not anything further was said by you or Miss Lamm or Mr. Cutting relative to what was to be done with the papers? A. In substance she said that if they would be delivered back to me for destruction it would be all right for him to take them. As to whether or not those papers were delivered to me again, yes, they were, the next forenoon at my desk in the Decorah State Bank by Carroll Cutting. I tore up those papers immediately afterward.

"Q. State whether you and Miss Lamm had any further conversation regarding those papers? A. On the same day I destroyed the papers Miss Lamm and I did have a conversation regarding them over the phone. She asked me if those papers had been returned and destroyed, and I told her they had been.

"Q. Did she or did she not say she wanted her property left to her legal heirs? A. She asked me after she had torn up the will what would happen to her property in case something happened to her before she had a will made.

"Q. What did you tell her? A. I told her in that case I believed her property would go to her legal heirs, whoever they were.

"Q. After you said that what response did Miss Lamm make, if any? A. She said that is just where I do not want it to go.

"Q. Now, Mr. Haines, she asked you that before or after she tore it up? A. My recollection is shortly after she had torn it up."

The witness testified that he did not see Miss Lamm at any time subsequent to December 21, 1953, and prior to February 5, 1954. Early in the afternoon of the latter date he was requested by Mr. Frank Miller to come to Miss Lamm's hospital room in connection with her will. When he reached the room there were present, Miss Lamm, Mr. Miller and Marjorie Anderson, the nurse. At this time Miss Lamm asked Mr. Haines if he would witness the signing of her will. She then directed Mr. Miller as to what disposition she wished to make of her property. Marjorie Anderson took written notes of these directions.

These directions were embodied in the will drawn by Mr. Miller and later in the afternoon after the witnesses were called to the hospital room of Miss Lamm, Mrs. Frances Houdek, the secretary of Attorneys Miller & Pearson, took the will of Miss Lamm, and a duplicate copy of it to her hospital room. Mrs. Houdek was a law secretary of long experience, who had attended the execution of many wills. Neither Mr. Miller nor Mr. Pearson was present at the execution of the will. The will is designated Exhibit "A" in the record. It consisted of two pages of typewriting.

The witnesses to signing and execution of the will by the testatrix were Dr. Ralph M. Dahlquist, her attending physician; Dr. R. N. Svendsen, who attended her when Doctor Dahlquist was not available; Mr. E. R. Haines, her banker; Marjorie E. Anderson, R.N., her attending nurse, and Mrs. Frances Houdek. All were present at the signing of the will by LuRene Lamm in her room, No. 121 in the Decorah Hospital, in the late afternoon of February 5, 1954. They surrounded her bed, the mattress of which had been raised so that she was in a semisitting posture,

with the will laying on a magazine in her lap on top of the bed coverings. Mrs. Houdek gave her the will and asked her if she desired those present to witness her execution of the will. She so requested. Mrs. Houdek began reading the first page of the copy of the will, and Miss Lamm with the will before her followed the reading and traced the lines with her finger. When Mrs. Houdek was about half way down the first page Miss Lamm stopped her and said " 'you are going too fast, I wish to read the will.' " Marjorie Anderson then took the copy from Mrs. Houdek and finished reading it. When Mrs. Houdek left the law office with the will to go to the hospital, Mr. Miller gave her his fountain pen to take along. When the will had been read, Mrs. Houdek handed the pen to Miss Lamm, who signed her name at the bottom of the first page. The space left for her signature was rather narrow and she remarked about "stinginess" with the paper. The first or top page was then turned back and Miss Lamm signed her name about half way down on the second page above where the word "Testatrix" had been typed. Both signatures were made with the same pen and in the presence of the witnesses. The will was handed about to the five witnesses named above, each of whom signed the will below the attestation clause in the presence of each other and of Miss Lamm. Nothing further was done and there was no other discussion about the will. All of the witnesses left the hospital room after the execution of the will was completed. All of the witnesses testified at the trial to the execution of the will in the manner above noted. After the signing of the will by Miss Lamm and the witnesses, Mrs. Houdek took the will from Miss Lamm back to the Miller & Pearson office and placed it, without folding, in the office file of Miss Lamm in the filing cabinet, which was kept locked after office hours. A separate file was not made for the will, as the law firm was handling other matters for Miss Lamm and it was placed in her general file. All of the witnesses to the will identified the exhibit as the identical instrument executed by Miss Lamm as her will.

The time for the proof of the will was fixed by the court for January 21, 1955. On May 2, 1955, amended and substituted objections to the probate of the will were filed by Rosalia L.

McAndrews and Anne L. Haagensen stating that they were two of the three surviving sisters of the testatrix, who were her only heirs-at-law. The objections stated in substance that: decedent at the time of the purported execution of the will was without testamentary capacity, and it was not her last will and testament; if it was executed by her, it was made, prepared and executed while she was under the influence of one Maxwell Krause or R. M. Dahlquist, M.D., Maurice Krause, Marguerite Krause, E. R. Haines, Frank R. Miller, Dr. Bernard D. Howland, Marjorie E. Anderson, R.N., Hazel Heuser, R.N., Lorraine Krause (wife of Maxwell Krause), Frances R. Houdek and Julian Moe, or the decedent was fraudulently induced to execute the will by the above named persons; the signature on the purported will was not the signature of decedent but was placed there without her knowledge or consent by someone other than the decedent, and is not her will; and that the purported will was not duly executed as required by law and therefore is not her last will.

The issues in this litigation are not complicated. They are those usually pertinent to will contests, but the printed record and arguments of the appellants are of extreme length. Appellee refers to appellants' opening brief and argument of 564 pages as "prolix." The same adjective is applicable to appellants' three-volume, 1045-page printed record. In addition there are several voluminous exhibits in nowise abstracted, including almost hourly reports in the Clinical Records for the fifty-eight days the testatrix was in the Decorah Hospital and from February 7 to February 12, 1954, the day of her death in St. Mary's Hospital at Rochester, Minnesota.

▆ Because of the great length of the printed matter presented to the court on this appeal and the volume of exhibits it is very difficult to make a concise statement of the proceedings. Briefly stated, the objections of the appealing contestants are (1) lack of testamentary capacity (2) undue influence (3) fraud (4) forgery of the testatrix's signature to the will, and (5) that the will was not duly executed.

At the close of proponent's evidence of due execution, the contestants moved for a directed verdict on this issue. The motion was overruled. After contestants rested their case on the

objections, proponent's motion for a directed verdict on all issues was overruled. Proponent then moved to separately withdraw from the jury each of the pleaded objections. This motion was sustained as to paragraphs 2 and 3, supra, alleging undue influence and fraud, and overruled as to paragraphs 1 and 4, alleging testamentary incapacity and forgery, and sustained with respect to paragraph (5), the question of due execution, except as to the genuineness of the signature of the testatrix, which was left in issue. Upon resting after the introduction of his rebuttal evidence, proponent moved for a directed verdict. The motion was overruled. His motion to separately withdraw each of the remaining issues was also overruled. Contestants, at the close of proponent's case, filed no motion for a directed verdict and rested after their rebuttal evidence. The testimony was closed after proponent offered no surrebuttal evidence. Proponent then renewed his motion for a directed verdict, which was overruled, although the court expressed doubt that either testamentary incapacity or forgery should be submitted to the jury; it stated that notwithstanding such doubt it felt the proper procedure was to overrule the motion for a directed verdict, and the testimony was closed. Proponent then renewed his motion for a directed verdict, which was overruled, with the court again expressing its doubt as to the submission of either testamentary incapacity or forgery. Proponent's renewal of his motion to withdraw both issues was again overruled. Contestants made no motion for a directed verdict at the close of all the testimony, and the case was submitted to the jury on the remaining issues— lack of testamentary capacity and forgery.

The trial was begun on December 5, 1955, and was submitted to the jury on December 19 following at 4:25 p.m., and at 9:08 that evening the jury returned its verdict: "We, the jury, find for the proponent. Find that the Will of LuRene Lamm, deceased, which will is in evidence as Exhibit 'A' is her valid will."

Contestants' Motion for New Trial and Motion for Judgment Notwithstanding the Verdict were each denied.

In support of the two issues alleged in their objections and submitted, contestants-appellants introduced the daily Clinical

Records of Miss Lamm's continuous confinement in the Decorah Hospital for fifty-eight days—December 11, 1953, to February 7, 1954—and in St. Mary's Hospital, Rochester—February 7, 1954, to her death February 12, 1954. Her attending physician, Dr. R. M. Dahlquist, in his written committal of Miss Lamm to the Decorah Hospital, stated in his "Final Diagnosis" her complaint in general was "weakness and bad legs", and more specifically, "extreme malnutrition, chronic alcoholism, chronic cardiovalvular disease, mitral insufficiency, varicose ulcers and chronic eczema of both legs." The deceased had suffered much from the affliction to her lower limbs before being hospitalized and much the greater part of her treatment in the hospitals was to relieve her suffering from the constant itching which impelled her persistent scratching, causing bleeding of her lower limbs from her hips down. The partial relief which she received was from continuous administration, both internally and externally, for sedation purposes, of demerol, seconal, morphine, aspirin, cortisone and other medication, and massaging with ointments. When suffering she was sometimes irritable and unco-operative and difficult to administer to, but in her periods of relief she was cheerful and in good spirits, rational and clear in mind, and enjoyed visiting with her attendants and callers and making numerous telephone calls. She listened to the radio and read books and the newspapers. She wrote and dictated letters. We find no support in the record for the allegations in the objections filed by the contestants to the probate of the will of the testatrix. The cause for whatever discord, if there was any, between the testatrix and the contestants, could reasonably be attributed to the latter. Shortly after LuRene was taken to the hospital in Decorah they called upon her singly and together and quarreled with her. The patient in the room across the hall from the room of the testatrix heard loud and angry words whenever they entered. On January 6, 1954, the contestants signed and swore to and filed with the Commissioners of Insanity of Winneshiek County an Information charging the testatrix was afflicted with insanity and a fit subject for custody and treatment in the State Hospital for the insane. A warrant was issued thereunder, the same day, to the sheriff or any constable to take her in custody.

The information was not withdrawn by the signers until the twenty-first day of January, 1954.

On January 6, 1954, testatrix wrote to her niece, Madeline Wells, a sister of proponent, complaining of her mistreatment by her sisters, and stating therein "Maxwell is here now taking care of my affairs so Ann and Rael [Rosalia] cannot do any more dirty work." The contestants testified that when they were denied entrance to LuRene's hospital room they would hear her say to the nurse: "I don't want them in here."

The testatrix had extensive property interests, consisting of real estate in Iowa, North Dakota, Nebraska, California and elsewhere, and much personal property, consisting of stocks, bonds, notes, cash and bank deposits and other assets, the estimated value of the aggregate being $264,756.17, as shown in the incomplete inventory of the coexecutors of her estate. Being physically unable to attend to her property, on January 4, 1954, she filed her voluntary petition in the court for the appointment of Julian Moe, of the Decorah State Bank, as guardian of her property. He qualified as such guardian.

Because of the persistence of contestants in coming into the hospital room of LuRene Lamm and annoying her and interfering with her recovery, on the petition of herself and her guardian, filed on January 7, 1954, the contestants were enjoined by temporary writ of injunction from entering her hospital room or having other personal contacts with her.

On January 7, 1954, replevin proceedings were instituted by the guardian against contestant Rosalia McAndrews for the possession of two bank-deposit boxes and their contents. On the same day the guardian and Miss Lamm had notice served on Rosalia to vacate Miss Lamm's home.

On February 13, 1954, contestant Anne L. Haagensen filed petition in the Probate Court of Olmstead County, Minnesota, alleging that her sister LuRene Lamm died a resident of Rochester in said county and state, leaving personal property of the value of $50,100 therein which it was necessary to secure and conserve, and praying that the Olmstead County Bank and Trust Company be appointed special administrator thereof. The prayer of the petition was granted on February 15, 1954, and the inventory of the appointee as of February 27, 1954, stated

the total value of the personal property of the deceased's said estate to be $106,239.65, of which $59,097.86 were stocks and $47,141.79 were notes and bonds. It was the contention of the proponent and the special administrator that these personal assets of hers had been wrongfully taken by the contestants out of Iowa into Minnesota. There was evidence that Rosalia had never paid LuRene any rent for the ten or more years she occupied LuRene's home in Decorah, nor had she paid her anything for her keep during that time.

The special nurses who attended Miss Lamm in the Decorah hospital testified that she was very much disturbed and angered about the insanity charge made against her and referred to it as an attempt "to take her civil rights away from her." On the day of her death in the hospital at Rochester the Nurses' Record states that one of the contestants "burst" into her room and attempted to discuss property matters until sent away, and shortly thereafter, Miss Lamm died in a convulsion in the arms of her nurse.

On the other hand, her relations with her nephew, Maxwell Krause, the proponent, were very close and friendly at all times. She visited with him by telephone from her hospital bed. His home was in Minnesota but he came often to her hospital room to cheer her and to discuss her property and business affairs with her. Witnesses testified to her reference to him as a "fine and upright young man." How different and to the contrary was the attitude of the contestants? They protested when she ordered the manager of the telephone company to disconnect the telephone in her home, and to put a telephone in her hospital room. The manager told them she was well enough to have a telephone and she should have it. They protested to the postmaster that her mail should be sent to her home, where they were living at her expense, and insisted that it be delivered to them, and they would take it to her.

I. There is no evidence in the record sustaining contestants' objections of undue influence, conspiracy, or fraud on the part of the proponent, or of anybody, in the execution of the will. These objections were rightly stricken by the court.

The five witnesses who signed the attestation clause, testified to the signing of the will by the testatrix on the first and last

pages of the will. Contestant Haagensen testified that the signatures on the will were not those of LuRene. Her cocontestant, Mrs. McAndrews, testified that she would recognize LuRene's signature if she saw it, but she was not asked to testify if either of the signatures on the will was that of LuRene.

Contestants offered two witnesses as handwriting experts. One, from Chicago, testified that the signatures on the will were made by someone other than the writer of the standard signatures offered by proponent, and made by LuRene. The other witness, giving like testimony for contestants, was a deputy sheriff of Polk County, Iowa.

In addition to the five witnesses who testified for proponent that they saw LuRene sign the will, were others, who were familiar with her signature and often saw her write her name. They were Alvin Renaas of the Decorah State Bank; Julian Moe, the guardian of her property; Wm. Ronan, vice-president of the Decorah State Bank, who each expressed his opinion that the signatures on the will were those of LuRene Lamm. Donald Doud, a full-time examiner of questioned documents, testified: "It is my positive opinion that the LuRene Lamm who wrote the known specimens also wrote her name on pages one and two of Exhibit 'A' ", the will.

Julian Moe testified that prior to and during her hospitalization he attended to the making of her bank deposits and the paying of her accounts, and also discussed her property interests in connection with preparing his inventory as guardian of her property, concerning which she gave him much information. Introduced in evidence were five checks of December 12, 1953, and eight checks of January 2, 1954, on her account in the Decorah State Bank. Moe had written the body of the checks and Miss Lamm had signed "LuRene Lamm" on each check. These were received in evidence as standards of comparison, and show remarkable similarity to the same signatures on the will. All the checks show payment by the bank on which they were drawn.

The contestants produced no witnesses that the will was not duly executed, and none that its execution was brought about by undue influence or fraud.

II. The trial court submitted the issue of testamentary capacity to the jury. On this issue the appellants insist the court erred in not directing a verdict for them at the close of proponent's case in rebuttal. We do not find that such a motion was made by contestants. It was made by proponent. The only direct evidence offered by contestants on the issue of the unsoundness of mind of testatrix when the will was executed was the testimony of Dr. Howard Turner, in answer to a long hypothetical question. His answer was that such a "hypothetical person" is "not of sound mind." On cross-examination, Doctor Turner stated: "No, I never seen the patient and not under ideal circumstances I formed my opinion."

Dr. Arthur F. Fritchen was called by contestants. He testified that he cared for LuRene Lamm from February 15, 1949, until August 7, 1949, and from January 31, 1950, until August 19, 1950. Contestants asked him no question as to her mental capacity.

Dr. Charles C. Inman, a chiropractor, testified for contestants that he treated LuRene Lamm from November 1951 to August 26, 1953. He was not asked about her mental capacity.

Dr. Warren Bennett, a pathologist with the Mayo Clinic, testified that he did not see LuRene Lamm while she was living. After receiving permission from contestant Haagensen he conducted a post-mortem examination of the body of LuRene Lamm, which showed a minimal hardening or sclerosis of the arteries, and that such part of the brain that was affected had to do principally with motor sensations control of the body, and only in a limited way with the mental processes of the frontal lobe or reasoning portion of the brain.

Those testifying to the mental soundness and testamentary capacity of the testatrix were: Dr. R. M. Dahlquist, her attending physician, who on referring to his patient's progress report of February 5, 1954, said: "I have a notation of February 5, 1954, 'mentally clear and alert'"; Dr. R. N. Svendsen, who attended her when Doctor Dahlquist was away, stated: "She impressed me as being of sound mind"; Hazel Heuser, whom contestant Haagensen was instrumental in securing as a nurse, stated that she was on duty from 7 a.m. until 3 p.m. on February 5, 1954, said the patient "was of sound mind";

Marjorie Anderson, on duty the same day from 3 p.m. to 11 p.m., gave like testimony; E. R. Haines, her banker, was present on the afternoon of February 5, 1954, when Miss Lamm was instructing lawyer Miller as to what she wanted in her will, testified: "It appeared to me she knew exactly what she was doing, and was of sound mind at that time"; Mrs. Mignon Tobiason, an old friend, visited her (LuRene) at the hospital in the latter part of January 1954 for two and a half hours, and they talked about little things in general. Asked whether Lu-Rene was of sound mind and rational, her answer was "Absolutely"; Donald Aspenson, and his father, Oscar, whom she had requested to see, called on her on January 31, 1954. LuRene, although she had not seen him for some time, took hold of his hand, with the greeting "Hello Oscar!". She then began visiting with them about her holdings in Investors Diversified Services, the company they represented, and stated she owed one more payment on her contract, "and she knew what her holdings were."

Appellants assign forty-two errors, covering many pages, upon which they rely for reversal. We are not going to further extend this too-long opinion with a discussion of these numerous and extended assignments. We have examined all of them and find no reversible errors.

The principles of law and procedure relating to the issues and the subject matter of this particular litigation and to testamentary dispositions in general have been too many times discussed by this court to justify further discussion of them. The verdict of the jury is amply sustained by the record and the judgment of the district court is therefore affirmed.—Affirmed.

All JUSTICES concur except SMITH, J., not sitting.